**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES LIN, | Civil Action No. |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| CINCINNATI BELL INC., LYNN A. WENTWORTH, MEREDITH J. CHING, WALTER A. DODS, JR., JOHN W. ECK, LEIGH R. FOX, JAKKI L. HAUSSLER, CRAIG F. MAIER, RUSSEL P. MAYER, THEODORE H. TORBECK, and MARTIN J. YUDKOVITZ, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff James Lin ("Plaintiff") by and through his undersigned attorneys, brings this action on behalf of himself, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Cincinnatti Bell Inc. ("Cincinnatti Bell" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's public statements; and (d) review of other publicly available information concerning Cincinnatti Bell and the Defendants.

**SUMMARY OF THE ACTION**

1.      This is an action brought by Plaintiff against Cincinnatti Bell and the Company's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed sale of the Company to institutional partners of Brookfield Infrastructure Partners L.P. (the "Proposed Transaction").

2.      On December 21, 2019, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Charlie AcquireCo Inc. ("Parent"), a Delaware corporation, and Charlie Merger Sub Inc. ("Merger Sub," and together with Parent, "Charlie").

3.      Pursuant to the Merger Agreement, the Company's shareholders will receive $10.50 for each share of the Company's common stock owned (the "Merger Consideration").

4.      On February 4, 2020, in order to convince the Company's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading proxy statement with the SEC (the "Proxy Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Cincinnatti Bell and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Cincinnatti Bell shareholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

6.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

7.      This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.   In addition, the Company's stock trades on the New York Stock Exchange ("NYSE"), which is headquartered in this District.

## THE PARTIES

9.      Plaintiff is, and has been at all times relevant hereto, a common shareholder of Cincinnatti Bell.

10.      Defendant Cincinnatti Bell is an Ohio corporation with its principle executive offices located at 221 E Fourth Street, Cincinnati, Ohio 45202.  The Company's common stock trades on the NYSE under the symbol "CBB."

11.      Defendant Lynn A. Wentworth ("Wentworth") is and has been the Chairman of the Company's Board at all times during the relevant time period.

12.      Defendant Meredith J. Ching ("Ching") is and has been a director of Cincinnatti Bell at all times during the relevant time period.

13.     Defendant Walter A. Dods, Jr. ("Dods") is and has been a director of Cincinnatti Bell at all times during the relevant time period.

14.     Defendant John W. Eck ("Eck") is and has been a director of Cincinnatti Bell at all times during the relevant time period.

15.     Defendant Leigh R. Fox ("Fox") is and has been the Company's Chief Executive Officer, President, and a director at all times during the relevant time period.

16.     Defendant Jakki L. Haussler ("Haussler") is and has been a director of Cincinnatti Bell at all times during the relevant time period.

17.     Defendant Craig F. Maier ("Maier") is and has been a director of Cincinnatti Bell at all times during the relevant time period.

18.     Defendant Russel P. Mayer ("Mayer") is and has been a director of Cincinnatti Bell at all times during the relevant time period.

19.     Defendant Theodore H. Torbeck ("Torbeck") is and has been a director of Cincinnatti Bell at all times during the relevant time period.

20.     Defenadnt Martin J. Yudkovitz ("Yudkovitz") is and has been a director of Cincinnatti Bell at all times during the relevant time period.

21.     Defendants Wentworth, Ching, Dods, Eck, Fox, Haussler, Maier, Mayer, Torbeck, and Yudkovitz are collectively referred to herein as the "Individual Defendants."

22.     The Individual Defendants, along with Defendant Cincinnatti Bell, are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

23.     Cincinnatti Bell delivers integrated communications solutions to residential and business customers over its fiber-optic and copper networks, including high-speed internet, video, voice and data.  The Company provides service in areas of Ohio, Kentucky, Indiana and Hawaii.  In addition, enterprise customers across the United States and Canada rely on CBTS and OnX, wholly owned subsidiaries of the Company, for efficient, scalable office communications systems and end-to-end IT solutions.

### The Company Announces the Proposed Transaction

24.     On December 21, 2019, the Company jointly issued a press release announcing the Proposed Transaction.  The press release stated in part:

> CINCINNATI, Dec. 23, 2019 /PRNewswire/ -- Cincinnati Bell Inc. (NYSE:CBB), together with Brookfield Infrastructure (NYSE: BIP; TSX: BIP.UN), today announced an agreement through which Brookfield Infrastructure and its institutional partners will acquire Cincinnati Bell in a transaction valued at approximately $2.6 billion, including debt (the "Transaction").
>
> Pursuant to the agreement, each issued and outstanding share of Cincinnati Bell common stock will be converted into the right to receive $10.50 in cash at closing of the Transaction. The Transaction price of $10.50 per share of Cincinnati Bell common stock represents a 36% premium to the closing per share price of $7.72 on December 20, 2019 and an 84% premium to the 60-day volume weighted average price. The Transaction has received unanimous approval of Cincinnati Bell's Board of Directors and is subject to customary closing conditions, including Cincinnati Bell shareholder approval and regulatory approval.
> Lynn A. Wentworth, Chairman of the Cincinnati Bell Board of Directors, said, "After thoroughly reviewing a range of strategic alternatives and possible business opportunities for maximizing value, the Board determined this transaction was in the best interest of the company, its shareholders, and its customers. The transaction provides clear and immediate value at an attractive premium and represents an exciting new chapter for Cincinnati Bell."
>
> Leigh Fox, President and Chief Executive Officer of Cincinnati Bell, continued, "The transaction strengthens our financial position, enabling accelerated

investment in our strategic products that is not presently available to Cincinnati Bell as a standalone company. This will allow us to drive growth and maximize value over the long term to the benefit of all our stakeholders. With Brookfield Infrastructure's support, we will be better positioned to deliver next generation, integrated communications for our customers through an expanded fiber network. Brookfield Infrastructure provides strong industry expertise with a proven track record of investment in critical data service and infrastructure. The financial, management, and other resources made available to Cincinnati Bell through the acquisition will enhance our networks and services to the benefit of our customers in Hawaii, Ohio, Kentucky, and Indiana, and across the nation."

"This investment represents an opportunity for Brookfield Infrastructure to acquire a great franchise and leading fiber network operator in North America," said Sam Pollock, Chief Executive Officer of Brookfield Infrastructure. "We are excited to leverage our operating expertise to work with the company's management team as it completes its industry-leading fiber optic rollout plan. Cincinnati Bell is a great addition to our data infrastructure portfolio and we expect it will contribute strong utility-like cash flows with predictable growth."

Cincinnati Bell owns and operates the leading data transmission and distribution network in Cincinnati, Ohio and Hawaii, with a footprint of over 1.3 million homes, delivering core fiber broadband, video and voice services to residential and enterprise customers. The business is undergoing an industry-leading transformation to upgrade its network to next generation fiber, which will be critical to support the growing demand for data and the advent of 5G. Thus far, Cincinnati Bell has future-proofed 50% of its network, representing more than 17,000 miles of dense metro and last-mile fiber and has plans to further upgrade its network over the next few years. The ongoing fiber upgrade allows Cincinnati Bell to provide utility-like services for broadband and data, generating stable and growing cash flows.

Brookfield Infrastructure is a leading global company with a long-standing history as an owner and operator of high-quality infrastructure assets. It has a global portfolio of assets in the utilities, transport, energy and data infrastructure sectors across North and South America, Asia Pacific and Europe.

The Transaction is expected to close by the end of 2020. It is subject to certain customary closing conditions, including the approval by Cincinnati Bell's shareholders, expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and certain regulatory approvals. Cincinnati Bell will file a current report on Form 8-K with the U.S. Securities and Exchange Commission containing a summary of the terms and conditions of the proposed acquisition as well as a copy of the merger agreement.

**Advisors**

White & Case LLP is serving as lead legal advisor to Brookfield Infrastructure on this Transaction. Financing will be led by a syndicate of banks including Bank of America, BMO Capital Markets Corp., Citigroup Global Markets Inc., TD Securities and Wells Fargo Securities, LLC.

Morgan Stanley & Co. LLC and Moelis & Company LLC are acting as financial advisors and Cravath, Swaine & Moore LLP, Morgan, Lewis & Blockius LLP, and BosseLaw PLLC are acting as legal advisors to Cincinnati Bell.

## FALSE AND MISLEADING STATEMENTS
## AND/OR MATERIAL OMISSIONS IN THE PROXY STATEMENT

25.     On February 4, 2020, the Company authorized the filing of the Proxy Statement with the SEC.  The Proxy Statement recommends that the Company's shareholders vote in favor of the Proposed Transaction.

26.     Defendants were obligated to carefully review the Proxy Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make informed decisions regarding whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Material False and Misleading Statements or Material
### Misrepresentations or Omissions Regarding Management's Financial Projections

27.     The Proxy Statement contains projections prepared by the Company's management concerning the Proposed Transaction, but fails to provide material information concerning such.

28.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such

projections.[1]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[2]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

29.     In order to make management's projections included in the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

30.     Specifically, with respect to each set of financial projections, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including Adjusted EBITDA.

31.     Disclosure of the above information is vital to provide investors with the complete mix of information necessary to make an informed decision when voting on the Proposed Transaction.

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

**Material False and Misleading Statements or Material**
**Misrepresentations or Omissions Regarding Morgan Stanley's Financial Opinion**

32.     The Proxy Statement contains the financial analyses and opinion of Morgan Stanley & Co. LLC ("Morgan Stanley") concerning the Proposed Transaction, but fails to provide material information concerning such.

33.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the estimated unlevered free cash flows used by Morgan Stanley in its analysis; (ii) the individual inputs and assumptions underlying the selection of the range of discount rates from 7.4% to 7.8%; and (iii) the basis for Morgan Stanley's selection of a range of exit multiples from 5.5x to 6.25x.

34.     With respect to Morgan Stanley's *Discounted Future Equity Value Analysis*, the Proxy Statement fails to disclose the individual inputs and assumptions underlying the range of discount rates between 11.7% and 12.9%.

35.     With respect to Morgan Stanley's *Equity Research Analysts' Price Targets*, the Proxy Statement fails to disclose which specific analysts were selected for Morgan Stanley's analysis, as well as the individual price targets observed in its analysis.

36.     Lastly, the Proxy Statement fails to disclose the information concerning past services provided to the parites by Morgan Stanley, specifically the timing and nature of any such services.

**Material False and Misleading Statements or Material**
**Misrepresentations or Omissions Regarding Moelis' Financial Opinion**

37.     The Proxy Statement contains the financial analyses and opinion of Moelis & Company LLC ("Moelis") concerning the Proposed Transaction, but fails to provide material information concerning such.

38.    With respect to Moelis' *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the estimated future unlevered after-tax free cash flows used by Moelis in its analysis; (ii) the individual inputs and assumptions underlying the selection of the range of discount rates of 8.00% to 9.25%; and (iii) the basis for Moelis' selection of a range of estimated terminal values of 5.75x to 6.50x.

39.    With respect to Moelis' price targets analysis, the Proxy Statement fails to disclose which specific analysts were selected for Moelis' analysis, as well as the individual price targets observed in its analysis.

40.    When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides shareholders with a basis to project the future financial performance of a company and allows shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion.

41.    Without the above described information, the Company's shareholders are unable to cast a fully informed vote on the Proposed Transaction.  Accordingly, in order to provide shareholders with a complete mix of information, the omitted information described above should be disclosed.

### COUNT I

**(Against All Defendants for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

42.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

43.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

44.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

45.     Defendants have issued the Proxy Statement with the intention of soliciting shareholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company.

46.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information

to shareholders although they could have done so without extraordinary effort.

47.     The Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

48.     The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

49.     The Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

50.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

51.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's

equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

52.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53.     The Individual Defendants acted as controlling persons of Cincinnatti Bell within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Cincinnatti Bell, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

54.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

55.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed

Transaction. They were thus directly involved in preparing this document.

56.    In addition, as set forth in the Proxy Statement sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

57.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

58.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

59.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.    Directing the Individual Defendants to disseminate an Amendment to the Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.      Directing Defendants to account to Plaintiff for all damages sustained because of the wrongs complained of herein;

D.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 25, 2020                                  Respectfully submitted,


                                                          By: */s/ Joshua M. Lifshitz*
                                                          Joshua M. Lifshitz
                                                          Email: jml@jlclasslaw.com
                                                          **LIFSHITZ & MILLER LLP**
                                                          821 Franklin Avenue, Suite 209
                                                          Garden City, New York 11530
                                                          Telephone: (516) 493-9780
                                                          Facsimile: (516) 280-7376

                                                          *Attorneys for Plaintiff*